# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS A. MURRAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  04 C 7669 |
| | ) | |
| INDYMAC BANK, F.S.B., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant Indymac Bank, F.S.B.'s ("Indymac") renewed motion for summary judgment on the issue of willfulness.  For the reasons stated below, we grant the motion for summary judgment.

## BACKGROUND

Plaintiff Thomas A. Murray ("Murray") claims that Indymac unlawfully accessed the credit reports of numerous Illinois consumers for the purpose of sending them letters offering a mortgage loan.  Murray alleges that he received such a letter ("Letter") in October 2004, which stated: "Information from a consumer report was used in conjunction with this offer."  (SA Compl. Ex. A).  The Letter allegedly

1

further stated: "This offer has been extended based upon information from this consumer credit report which indicates that you meet certain criteria for the offered credit." (SA Compl. Ex. A).  According to Murray, Indymac initiated the obtaining of Murray's consumer credit report and the Letter from Indymac does not contain a firm offer of credit, and therefore is in violation of the Fair Credit and Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*.  Murray also argues that the Letter does not include certain required disclosures in a clear and conspicuous manner as is required under the FCRA.  Furthermore, Murray contends that Indymac's actions were done willfully in violation of 15 U.S.C. §1681n of the FCRA.

Murray's counsel entered into settlement negotiations with Indymac on behalf of Murray and the purported class referenced in the amended complaint.  On January 12, 2006, we entered the final approval order for a settlement between Indymac and the Plaintiff class.  Subsequently, certain individual class members ("Individual Class Members") sought to intervene in the action contending that they did not receive proper notice of the proposed settlement and indicating that they objected to the settlement.  We denied the motion to intervene as moot since we already entered the final approval order for the settlement.  The Individual Class Members then filed a motion to vacate the January 12, 2006, order.  Since the Individual Class Members showed that they did not receive proper notice of the proposed settlement in advance of the January 12, 2006, ruling, we granted the motion to vacate and reinstated the instant action.

Murray then moved for leave to file a second amended complaint, excluding

the Individual Class Members from this action, and a motion for class certification. We granted both motions and on August 29, 2006, Plaintiffs filed a motion for summary judgment and Indymac filed a cross-motion for summary judgment. On November 7, 2006, we granted Murray's motion for summary judgment as to the violations of the "firm offer of credit" and "clear and conspicuous" disclosure requirements of the FCRA and we denied Indymac's motion for summary judgment on those claims. We also denied both sides' motions on the issue of whether there was a willful violation of the FCRA. Indymac then moved to vacate the November 7, 2006, ruling to the extent that the court ruled concerning the issue of willfulness and moved to stay the action. Indymac indicated that a ruling in the United States Supreme Court was imminent in *Safeco Ins. Co. of America v. Burr*, which would clarify the proper standard for willfulness under the FCRA. In light of the upcoming ruling by the United States Supreme Court, we granted the motion to vacate and motion to stay. On June 4, 2007, the Court ruled in *Safeco Ins. Co. of America v. Burr*, 127 S.Ct. 2201 (2007), and on June 26, 2007, we gave the parties an opportunity to file renewed motions for summary judgment on the issue of willfulness. Indymac has filed the instant motion for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.

Civ. P. 56(c).  In seeking a grant of summary judgment, the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Id.* at 325.  Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);  *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).  The court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).

## DISCUSSION

Murray bases his claims upon violations of 15 U.S.C. §1681b ("Section 1681b") and 15 U.S.C. §1681m ("Section 1681m"). Section 1681b(c) and (f) provide that "[a] person shall not use or obtain a consumer report for any purpose unless . . . the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section," and "[a] consumer reporting agency may furnish a consumer report relating to any consumer . . . in connection with any credit or insurance transaction that is not initiated by the consumer only if . . . the consumer authorizes the agency to provide such report to such person; or . . . the transaction *consists of a firm offer of credit or insurance*." 15 U.S.C. § 1681b (emphasis added). Section 1681m requires "[a]ny person who uses a consumer report on any consumer in connection with any credit or insurance transaction that is not initiated by the consumer" must "provide with each written solicitation made to the consumer regarding the transaction a clear and conspicuous statement that" contains certain specific information. 15 U.S.C. § 1681m(d). Indymac contends that although we previously found that the Letter violated Section 1681b and Section 1681m, in light of the recent ruling in *Safeco*, the court can conclude as a matter of law that the violations of the FCRA were not willful violations.

I.  Broad Scope of Prior Motions for Summary Judgment

As indicated above, in regard to the parties' prior motions for summary judgment on the issue of willfulness, we denied the motions, finding that there was insufficient evidence to warrant making a finding as a matter of law for either side.

We concluded that the willfulness issue could only be resolved by the trier of fact. (11/7/06 OP 15-17). We subsequently vacated that ruling on the willfulness issue in light of the upcoming ruling in *Safeco*. It is also worth noting that due to the fact that the prior motions for summary judgment needed to address a variety of issues concerning the violations of the FCRA, in addition to the willfullness issue, the parties were able to devote only limited attention to the willfullness issue in their prior motions. In the instant renewed motion for summary judgment, however, the parties were able, for the first time, to devote their full attention to the willfulness issue. Thus, in Indymac's renewed motion for summary judgment, not only is the court presented with a new legal standard for the willfullness issue, the court has also been presented with a much more complete and comprehensive view of the parties' legal arguments on the willfulness issue, which could support a different result than the one accorded to Indymac's original motion for summary judgment.

## II.  Knowing Violation of FCRA

In *Safeco*, the Court indicated that a plaintiff can establish a willful violation of the FCRA by showing a "knowing violation" of the FCRA. 127 S.Ct. at 2208. In this case, Murray does not point to any evidence that shows that Indymac employees knew that the Letter violated the FCRA. Murray admits, pursuant to Local Rule 56.1, that the employees in Indymac's internal compliance department ("Compliance Department") were not aware of law or regulations that would have alerted them that the Letter violated the "clear and conspicuous" requirement of the FCRA when the

6

Letter was mailed. (R SF Par. 32). Although Murray argues that the Indymac employees' "requisite knowledge" is a question of fact that should be assessed by the trier of fact, (Ans. 4), Murray has been allowed to conduct discovery in the instant action and thus has had the opportunity to collect evidence concerning the knowledge and intent of Indymac's employees. Despite that opportunity, Murray has failed to point to sufficient evidence showing that the employees had the knowledge or intent that would show a willful violation of the FCRA. Murray cannot simply ask the trier of fact to speculate that the Indymac employees knew that they were violating the FCRA or that they intentionally violated the FCRA. Indymac has, on the other hand, pointed to evidence concerning matters such as Indymac's FCRA compliance process that the Letter passed through, which supports a conclusion that the Indymac employees believed in good faith that the letter did not violate the FCRA. Thus, Murray has failed to show that a reasonable trier of fact could conclude that Indymac employees acted in bad fath and knowingly violated the FCRA.

### III.  Objective Standard for Reckless Determination

In *Safeco* the Court stated that, aside from showing a knowing violation of the FCRA, a plaintiff could establish willfulness by showing a "reckless disregard of statutory duty. . . ." 127 S.Ct. at 2208. (stating that "where willfulness is a statutory condition of civil liability, [the Court has] generally taken it to cover not only knowing violations of a standard, but reckless ones as well"). The Court in *Safeco*

applied the common law meaning to "reckless," which is defined as "conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Id.* at 2209, 2215 (referring to the "general rule that a common law term in a statute comes with a common law meaning"). Thus, the Court in *Safeco* emphasized that in the absence of evidence that a FCRA violation was done knowingly, a determination as to recklessness, and thus willfulness of a FCRA violation, must be based on the objective perspective. *Id.* at 2215.

## IV.  Pre-screening and Compliance Process

Indymac argues that its determination that the Letter did not violate the FCRA was not reckless in light of the undisputed evidence that establishes that Indymac took significant precautions to ensure that all of its mailings, including the Letter, did not violate the FCRA. Indymac argues that the mere fact that, in hindsight, the Letter turned out to violate the FCRA does not show that Indymac's decision to mail the Letter was unreasonable based upon an objective view of the circumstances.

### A.  Pre-screening

Indymac contends that it made efforts to, at least in part, pre-screen its customers before mailing materials to the customers. Murray admits that one way that Indymac selected customers for direct mail marketing was to pre-screen customers. (R SF Par. 4). Murray also admits that Indymac retained one of the three

major credit reporting agencies "to provide a list of names and addresses of persons whose consumer reports satisfy certain pre-selected criteria (such as presence of mortgage and credit score)." (R SF Par. 6). In addition, Murray admits that Indymac directed one credit reporting agency to create a list of customer names and addresses of customers that met certain minimum underwriting guidelines and predetermined pre-screening criteria. (R SF Par. 7). Thus, the undisputed evidence shows that Indymac took steps to, at least in part, pre-screen customers before mailing out marketing information.

### B. Compliance Process

Indymac also contends that it had a compliance process in place during the time period when the Letter was mailed. Indymac claims that under the compliance process, materials needed to be reviewed and approved by Indymac employees for compliance with the law before the materials could be mailed out to customers. Murray concedes, pursuant to Local Rule 56.1, that prior to an initial direct mail campaign or mailing program by Indymac, Indymac conducted a "lengthy approval process." (R SF Par. 10). Murray also admits that before Indymac mailed out any letter to customers, a draft of the letter was given to the Compliance Department at Indymac ("Compliance Department") for its review and approval and that, absent approval, the letter would not be sent out to customers. (R SF Par. 11-12). It is also undisputed that the Compliance Department evaluation involves checking to see if a letter complies with certain regulations and statutes such as the FCRA. (R SF Par.

12); (McGov. Dep.23).

### 1. McGovney's Supervision of Compliance Process

Indymac asserts in paragraph 14 of its statement of material facts ("Paragraph 14") that Susan E. McGovney ("McGovney"), Indymac's Senior Vice President, Corporate Compliance Officer, "establishes internal compliance procedures and ensures that those compliance procedures are properly and consistently followed by Indymac's Compliance officers." (SF Par. 14). Murray attempts to dispute those facts. (R SF Par. 14). We first note that on this issue Murray separately concedes that McGovney "reviews the compliance records herself to ensure that the members of the Compliance group are following the procedures she established." (R SF Par. 24).

Also, Murray has not provided a proper basis to dispute the facts in Paragraph 14. Murray, in response to Paragraph 14, points to no evidence that would support facts that contradict those in Paragraph 14. Murray has not even argued that any specific compliance procedure was flawed or that McGovney did not, as Indymac asserts in Paragraph 14, ensure that the Indymac employees followed the procedures. Rather, Murray's position has consistently been that the existence of the compliance process is meaningless since the Compliance Department employees were not made aware of the applicable law of the FCRA and since the process did not prevent the FCRA violations at issue in this case. (Ans. 5, 13)(stating that Indymac's "failure to utilize an attorney . . . makes its purported legal compliance practices and policies

meaningless."); (R SF Par 11-12)(admitting to existence of approval process, but denying that process resulted in compliance with FCRA).

Murray's only response to Paragraph 14 is that since the FCRA violations at issue in this case occurred, the Compliance Department employees must not have followed the compliance procedures or the procedures were improper since "[a] compliance procedure which results in the mailer sent to plaintiff was not proper." (R SF Par. 14). However, such conclusory logic is not sufficient to support a contention that a fact is disputed pursuant to Local Rule 56.1. The mere fact that a FCRA violation was not detected by the compliance procedures at Indymac does not in itself prove that the procedures were not followed or that they were improper. Murray does not cite any evidence in response to Paragraph 14 demonstrating that Compliance Department employees did not follow the compliance procedures, or that McGovney did not ensure that the employees followed the procedures. In the absence of any citation to evidence by Murray that contradicts the facts in Paragraph 14, the facts in Paragraph 14 are undisputed which state that McGovney "establishes internal compliance procedures and ensures that those compliance procedures are properly and consistently followed by Indymac's Compliance officers." Local Rule 56.1; *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004)(stating that "a district court is entitled to expect strict compliance with Rule 56.1"); *Dent v. Bestfoods*, 2003 WL 22025008, at *1 n.1 (N.D. Ill. 2003)(indicating that a denial is improper if the denial is not accompanied by specific references to admissible evidence, or at least evidence that represents admissible evidence, and

that any facts included in a party's statement of facts that are not properly denied by the opposing party are deemed to be admitted); *Jankovich v. Exelon Corp.*, 2003 WL 260714, at *5 (N.D. Ill. 2003)(indicating that evasive denials that do not directly oppose an assertion are improper and thus the contested fact is deemed to be admitted pursuant to Local Rule 56.1).

We also note that Indymac has filed a motion to strike certain responses by Murray to Indymac's statement of material facts due to non-compliance with Local Rule 56.1. We have applied Local Rule 56.1 to all of the parties' Local Rule 56.1 filings and have not considered, for example, improper argumentative responses and improper legal conclusions included in the Local Rule 56.1 filings. Thus, we deny Indymac's motion to strike as moot.


2. Resources of Compliance Department

Indymac also points to the resources of its compliance process to support its contention that the Compliance Department gave meaningful consideration to the issue of compliance with the FCRA before mailing out the Letter. Although Murray contends that the compliance process in place at Indymac was meaningless, (Ans. 5, 13), Murray admits, pursuant to Local Rule 56.1 that the Compliance Department "in or about September 2004, included over 35 Compliance officers and had an annual budget of approximately two million ($2,000,000.00) dollars." (R SF Par. 16). Murray also acknowledges that Indymac's compliance program is "extensive" and "well-funded." (Ans. 13). Such undisputed facts dispel any notion that the

Compliance Department was a fictitious department in name only that existed solely for the sake of appearance. Thus, based on the above, the undisputed facts show that Indymac had an established compliance process in place to ensure compliance with the FCRA and that McGovney oversaw the administration of the process and ensured that Indymac employees followed the compliance procedures.

### C. Compliance Department Employees' Knowledge of the Law

Murray also argues that regardless of the compliance procedures put in place by Indymac, the process was fundamentally flawed because the Compliance Department employees were not knowledgeable as to the current FCRA law. (R SF Par. 15). Indymac asserts that McGovney "and members of her staff have kept abreast of legal developments affecting compliance under the [FCRA] and other statutes in numerous ways, including reviewing the Federal Register, information received from numerous law firms, information published by the FTC, and information available through the American Bankers' Association, the Mortgage Bankers' Association, and the California Bankers' Association." (SF Par 15). Murray disputes those facts, contending that the resulting violations of the FCRA by the Letter show that the Compliance Department employees were not knowledgeable as to the current law.

### 1. Attorney Advice

The main basis for Murray's position that the Compliance Department

employees were not knowledgeable as to the current law is that neither McGovney nor the other Compliance Department employees are attorneys and the Compliance Department did not consult with attorneys.  (Ans. 5, 13-14); (R SF Par. 15-19). Murray states that Indymac's "failure to utilize an attorney, who would have known of numerous cases dealing with prescreening, firm offers of credit and the meaning of 'clear and conspicuous,' makes its purported legal compliance practices and policies meaningless."  (Ans. 5).  Murray contends that the Compliance Department employees were not knowledgeable as to the law, and "[t]his lack of knowledge is attributable to [their] failure to consult with counsel."  (Ans. 14).

### a.  Evidence that McGovney Consulted with Attorneys

Despite Murray's assertions to the contrary, Indymac points to evidence that shows that McGovney consulted with attorneys in the operation of the Compliance Department.   McGovney stated in her affidavit that if she required answers to certain legal questions she would contact Indymac's legal department or be directed to contact outside counsel.  (McGov. Aff. Par. 6).  McGovney also testified at her deposition that she received information concerning updates in the law from law firms.  (McGov. Dep. 25-26).  Indymac also included in paragraph 27 of its statement of material facts ("Paragraph 27") that McGovney consulted with attorneys.  (SF Par. 27).  Murray disputed Paragraph 27, but Murray failed to point to any evidence that contradicts McGovney's assertion that she consulted with counsel. (R SF Par. 27).  Instead, Murray avoids the issue by contending that Indymac is

somehow foreclosed from pursuing this point because McGovney "was instructed by counsel to not provide any testimony as to the involvement of in-house or outside counsel, on grounds of privilege." (R SF Par. 27).

Murray incorrectly depicts what occurred at McGovney's deposition in order to utilize the deposition testimony as a basis to dispute the fact that McGovney consulted with attorneys. McGovney did not deny during her deposition that she consulted attorneys for legal questions, and McGovney did not contradict her affirmations provided on the topic in her affidavit. Rather, at the deposition, McGovney's counsel merely made it clear that McGovney would not discuss the specific content of the communications that McGovney had with counsel since such communications were protected by the attorney-client privilege. (McGov. Dep. 26). Murray's counsel was not precluded from exploring in a general fashion whether McGovney consulted with counsel in the operation of the Compliance Department. Murray's counsel chose not to explore that line of questioning and cannot blame Indymac for the lack of evidence on that point to support Murray's case. McGovney did testify at her deposition that she received certain information concerning updates in the law from law firms. (McGov. Dep. 25-27). In response to Paragraph 27, Murray failed to cite to evidence that supports Murray's contention that the facts are disputed, and the facts contained in Paragraph 27 are deemed to be undisputed. Thus, pursuant to Local Rule 56.1, it is undisputed that McGovney, who oversaw the operation of the Compliance Department did consult with attorneys as part of her duties.

<u>b.  Even if Attorneys Were Not Consulted</u>

We also note that even if Murray could show that the Compliance Department did not consult with attorneys or that the factual issue is a genuinely disputed issue, there is no reason why the Compliance Department employees necessarily had to be attorneys or consult with attorneys in order to properly understand the current law that they dealt with in the compliance process.  When it comes to understanding one's work requirements, attorneys have not cornered the market on knowledge of the law.  Nothing prohibits lay persons from being equally informed in the law as to one's job performance.  In fact, even if the Compliance Department included attorneys, the mere fact that an attorney was working in the Compliance Department would not have necessarily guaranteed that the Compliance Department was kept up to speed on the current law.  An employee in the Compliance Department who is an attorney and who does not keep up with the current developments in the law would be as uninformed of the current law as would a lay person.

Thus, Murray must do more than simply point out that the Compliance Department employees were not attorneys and did not consult with attorneys.  Murray must also show that the employees did not independently keep up with developments in the law relating to their duties and Murray has failed to point to evidence to support such a conclusion.  Indymac has pointed to evidence that shows that the Compliance Department employees did make efforts to keep up with the current law.  For example,  McGovney testified at her deposition that she learned about the updates in the law from a variety of sources, such as through information

16

she obtained from the Federal Register, law firms, and banking and mortgage associations. (McGov. Dep. 25-26). Thus, even if the Compliance Department employees did not consult attorneys, Murray has not pointed to sufficient evidence that shows that the employees were not knowledgeable as to the current law.

### 2. Experience, Qualifications and Training of Employees

Indymac contends that the employees in the Compliance Department have extensive work experience and qualifications and that they receive training, which shows that they were knowledgeable as to the current law. Murray admits that the Compliance Department employees "receive regular training on FCRA requirements among other consumer statutes," and that Compliance Department employees are required to "at least once a year . . . attend seminars and conferences organized by various trade associations" and are required to attend "regular internal training seminars." (R SF Par. 17). Murray also concedes that each Compliance Department employee is required to individually familiarize himself or herself with the pertinent FCRA law. (R SF Par. 17). Murray also does not dispute that certain Compliance Department employees have certain credentials and experience concerning compliance issues. (R SF Par. 17-18). Thus, the undisputed training and credentials of the Compliance Department employees shows that they were knowledgeable as to the current law.

### 3. Law Around October 2004

Murray contends that the law was such during the time period when the Letter was mailed that the FCRA violations in the Letter should have been obvious to the Compliance Department employees since the Letter "grossly violated" the FCRA. (Ans. 6). Murray argues that the glaring nature of the FCRA violations shows that the Compliance Department employees were not knowledgeable as to the current law. (R SF Par. 15, 17). We disagree as to Murray's depiction of the state of the law in the Seventh Circuit around October 2004.

The main basis for Murray's contention that the Letter violated the FCRA was the ruling in *Cole v. U.S. Capital,* 389 F.3d 719 (7th Cir. 2004). In *Cole*, the Seventh Circuit clarified the law in regard to the "firm offer of credit" requirement of the FCRA. *Id.* at 728. The Court stated that "[t]o determine whether the offer of credit comports with the statutory definition, a court must consider the *entire* offer and the effect of *all* the material conditions that comprise the credit product in question," and that "[i]f, after examining the entire context, the court determines that the 'offer' was a guise for solicitation rather than a legitimate credit product, the communication cannot be considered a firm offer of credit." *Id.* (emphasis in original). The Court in *Cole* also clarified the law as to the "clear and conspicuous" requirement of the FCRA. *Id.* at 729. The Court in *Cole* proceeded to offer guidance regarding the meaning of the "clear and conspicuous" requirement, referring to sources such as the Uniform Commercial Code. *Id.* at 729-30.

Murray, in arguing that the Compliance Department employees did not keep abreast of the current law, points to the decision in *Cole* as evidence of their lack of

understanding. (R SF Par. 15, 17). While the ruling in *Cole* provided key guidance as to the FCRA requirements, the ruling was not issued until November 2004, after the Letter had already been approved by the Compliance Department and mailed out by Indymac. The Compliance Department cannot reasonably be held accountable in hindsight for not having knowledge of a ruling that had not yet been made by the Seventh Circuit.

Murray also cites to decisions from a variety of other Circuits aside from the Seventh Circuit, arguing that such decisions clearly indicated in October 2004 that the Letter violated the FCRA. (R SF Par. 15, 17). However, such decisions were merely persuasive authority in the Seventh Circuit and were not controlling authority. Indymac also provides reasonable arguments by which it distinguishes the mailing of the Letter from the issues addressed in some of the cases cited by Murray. Murray cites, for example, *Trans Union Corp. v. F.T.C.*, 267 F.3d 1138 (D.C. Cir. 2001), contending that the ruling showed that the Letter would violate the FCRA and pointing out that the conclusions in *Trans Union* were "expressed years before *Cole* and before [Indymac's] mailer. . . ." (Ans. 10). However, *Trans Union* was not controlling precedent in the Seventh Circuit, where Murray has brought the instant action and Indymac has offered a reasonable basis to have believed that *Trans Union* was distinguishable from the issues connected to the Letter. (Reply 5, 7); *see also Murray v. GMAC Mortg. Corp.*, 2007 WL 2317194, at *5 (N.D. Ill. 2007)(indicating that "[t]he *Trans Union* opinion represented only a single appellate court on this issue, and the language cited by [the] [p]laintiff amounts to the relatively opaque

advice that mailers should be more like 'guaranteed offers of credit' and less like 'catalogs and sales pitches'"). Murray points to regulations and the rulings in other Circuits and presumes that all of the decisions and regulations were unknown to the Compliance Department employees or that the decisions and regulations were "ignored by" the employees. (Ans. 6-7, 7 n.4). However, along with such conclusory allegations Murray does not point to one piece of evidence showing that either the Compliance Department employees were unaware of any particular case or that the employees ignored any particular case. Murray has been given the opportunity to conduct discovery in this case and he must support his contentions at this stage of the proceedings with evidence, which he does not. Murray must do more than simply speculate that the Compliance Department employees were unaware of cases or regulations or ignored them. Murray has not cited to any case law, statute, regulatory authority, or other legal guidance in effect in October of 2004 that would have adequately informed Indymac that the Letter violated the FCRA. Indymac has provided reasoning and has pointed to law and other guidance that shows that Indymac's position was not unreasonable. (SJ Mem. 7); (Reply 6).

Murray does cite two Seventh Circuit rulings that were issued before the Letter was mailed. Murray cites *Lifanda v. Elmhurst Dodge, Inc.*, 237 F.3d 803, 805 (7th Cir. 2001) and *Channell v. Citicorp Nat. Servs., Inc.* 89 F.3d 379, 386 (7th Cir. 1996). (R SF Par. 15, 17). However, the Seventh Circuit did not provide guidance as to the FCRA in either *Lifanda* or *Channell*, as it did in *Cole*. In fact, in *Lifanda*

the Court made determinations concerning provisions of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* 237 F.3d at 805. No FCRA claim was before the Court in *Lifanda.* Similarly, in *Channell*, the Court dealt with claims brought under the Consumer Leasing Act, 15 U.S.C. §§ 1667-1667e, and the Court did not make a ruling concerning FCRA claims. 89 F.3d at 380. The mere possibility that the Seventh Circuit might have looked to *Lifanda* and *Channell* in the future for guidance in formulating the law as to the FCRA, is not sufficient to establish that Indymac's determination that the Letter did not violate the FCRA was reckless and thus willful.

Finally, it is significant in assessing the decision of the Compliance Department to approve the Letter that it is undisputed that the FCRA itself does not define the phrase "clear and conspicuous" and the statutory definition of "firm offer of credit" offers only general guidance in determining whether the condition is met. Interpretation of the phrases has been left to the courts, which makes it even harder to conclude that Indymac was reckless. The Seventh Circuit in *Cole* specifically noted that "[t]he FCRA does not define the term 'clear and conspicuous,' and, in fact, there [wa]s little case law interpreting the term as used in § 1681m." 389 F.3d at 729.

Murray has failed to point to any case or regulation in any Circuit in effect before October of 2004, when Murray received the Letter, that would have alerted the Compliance Department employees that the Letter violated the FCRA. Mere

trends in the law in lower courts and in other Circuits were not sufficient to put the Compliance Department on notice that the Seventh Circuit was going to rule as it did in *Cole*. Thus, based upon the undisputed evidence, no reasonable trier of fact could conclude other than that Indymac's determination before mailing the Letter that it did not violate the FCRA was an objectively reasonable determination. This conclusion is also consistent with the concern expressed in *Safeco* that "[w]here . . . the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator" and that "Congress could not have intended such a result for those who followed an interpretation that could reasonably have found support in the courts . . . ." 127 S.Ct. at 2216 n.20. *See also Murray*, 2007 WL 2317194, at *6 (finding that the defendant's "interpretation was not 'objectively unreasonable'"). Murray has not pointed to sufficient evidence that shows that the interpretation of the FCRA at the time of the mailing of the Letter was not a reasonable interpretation of the FCRA. The fact that there were other reasonable interpretations in line with the law that Murray now advocates does not mean that the Compliance Department's action or interpretation was unreasonable. The undisputed evidence concerning the pre-screening efforts and the compliance process clearly show that Indymac's conduct was not objectively unreasonable and Indymac did not ignore an unjustifiably high risk of harm that was known or reasonably should have been known. In addition, the law in effect at the time of the mailing of the Letter was not such that it could

22

reasonably have been expected to alert Indymac that there was a high risk of the Letter violating the FCRA. Thus, based on the above, an objective view of the undisputed evidence clearly shows that Indymac's determination that the Letter did not violate the FCRA was not a reckless determination.


## V.  Factual Issue for the Trier of Fact

Murray also argues that we should deny Indymac's renewed motion for summary judgment because "[w]hether [Indymac] violated the FCRA recklessly is a fact question."  (Ans. 1).  Simply because the contested issue is a factual issue, does not mean that Murray is entitled to proceed to trial.  Summary judgment is an appropriate juncture to resolve factual issues as a matter of law in instances where one side lacks sufficient evidence to support its position on the factual issues and where exists undisputed facts.  *See Matsushita*, 475 U.S. at 586 (stating that a "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts").  Rule 56(c) specifically indicates that a plaintiff can defeat a defendant's motion for summary judgment only if there is a "genuine issue as to any material fact," meaning that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 247-48; Fed. R. Civ. P. 56(c).  In the instant action, there is not a genuine issue of fact as to whether Indymac's employees recklessly and willfully violated the FCRA, simply, for example, because they did not predict the course taken by the Seventh

Circuit in *Cole.* Based on the above, no reasonable trier of fact could conclude that Indymac knowingly or recklessly violated the FCRA. Therefore, based on all of the above, we grant Indymac's renewed motion for summary judgment on the issue of willfulness.

## VI. Effect of Willfulness Determination

As indicated above, we have previously found as a matter of law that the Letter did not comply with Section 1681b and Section 1681m of the FCRA. However, Murray makes clear in the second amended complaint that he is solely alleging willful violations of the FCRA under 15 U.S.C. § 1681n. (SA Compl. Par. 21-22). Murray does not indicate in the complaint that he is alleging negligent violations of the FCRA under 15 U.S.C. § 1681o. Indymac also raises this point in its renewed motion for summary judgment, (SJ Mem. 4), and Murray does not contest Indymac's statement that Murray is only bringing claims based upon willful violations of the FCRA. Thus, since we have found as a matter of law that no reasonable trier of fact could find that Indymac willfully violated the FCRA, Murray's FCRA claims, which are premised upon Indymac's alleged willfulness, must fail in their entirety.

**CONCLUSION**

Based on the foregoing analysis, we grant Indymac's renewed motion for summary judgment. We also deny Indymac's motion to strike as moot.


_____
Samuel Der-Yeghiayan
United States District Court Judge

Dated:   September 13, 2007